OPINION
Defendant, Michael Steward, appeals from the judgment of the Franklin County Court of Common Pleas convicting him of one count of aggravated robbery in violation of R.C. 2911.01(A)(1) and one count of involuntary manslaughter in violation of R.C. 2903.04(A), along with firearm specifications charged in each count. Defendant also appeals the sentence imposed upon him for his convictions. We affirm defendant's convictions and reverse and remand defendant's sentence.
On May 26, 1999, defendant was indicted by the Franklin County Grand Jury on three counts of aggravated murder, one count of aggravated robbery, and one count of aggravated burglary.[1] All charges arose from an incident in which it was alleged that defendant killed Johnny "Little Black" Simmons during the commission of an aggravated robbery. Each of the five counts carried a firearm specification.
On August 1, 2000, the case came on for trial before the court, defendant having waived his right to trial by jury. At the conclusion of its case, the state requested dismissal of counts two, three and five. The court granted the motion for dismissal.
On August 4, 2000, the court found defendant guilty of the lesser included offense of involuntary manslaughter in count one and aggravated robbery in count four, along with the firearm specifications charged in those counts. By judgment entry filed August 4, 2000, the court imposed a sentence of nine years on the involuntary manslaughter count and six years on the aggravated robbery count, to be served consecutively. The court also imposed an additional three-year term of incarceration for use of a firearm. Defendant has timely appealed his conviction, setting forth three assignments of error, as follows:
 [1]. The judgment of the trial court is contrary to the weight of the evidence.
 [2]. Appellant's convictions are not supported by sufficient evidence.
 [3]. The trial court erred by imposing consecutive sentences without making the findings required by R.C. 2929.14.
The state's evidence consisted of the following. Kia Green testified that in March 1999, she lived with her friend, Nicole Franks, in Franks' one-bedroom apartment on Oak Street in Columbus, Ohio. Around 4:00 p.m. on March 11, 1999, defendant and Quazell[2] Neal, friends of both Franks and Green, stopped by the apartment so that Franks could braid Neal's hair. While defendant and Neal were in the apartment, Green's friend, Simmons, stopped by to see her. Green overheard defendant say "I should go over there and do him" (Tr. 136), to which Neal replied "No don't he don't have nothing but a little bit of money and a ring." (Tr. 136.) Green understood defendant's comment to mean that he wanted to rob Simmons. Simmons stayed for a few minutes and then left. Defendant and Neal left shortly thereafter.
Simmons returned to Franks' apartment later that evening. Simmons and Green watched a videotape in the bedroom while Franks took a bath. A short time later, Green and Franks heard gunshots outside. Franks answered a knock at the door and defendant, Neal, and a third man, Alonzo Adkins, entered the apartment. As Green walked down the hallway toward the bedroom, Simmons exited the bedroom, carrying a "real small gun" (Tr. 138) in his right hand. Simmons asked Green who had fired the gunshots. Green responded that defendant and his friends were outside "cutting up" (Tr. 139) and not to worry about it. Simmons then turned around and walked toward the bedroom. Green went into the kitchen where defendant, Franks, Neal and Adkins were gathered. Defendant then left the kitchen, carrying a "black" gun. (Tr. 130.) He followed Simmons down the hallway toward the bedroom. Green heard Simmons say "no, Boobie, no"[3] (Tr. 141) and saw the two men struggling in the hallway. Both men had guns in their right hands. Green saw defendant raise his right hand and shoot toward Simmons' face. A few seconds later, she heard a second gunshot. She and Franks then ran out of the apartment. Soon thereafter, Simmons ran out the front door and down the street. Defendant, Neal and Adkins followed Simmons outside; someone handed Adkins a gun and he shot toward Simmons. The three men then fled down an alley.
Franks' version of the incident differed slightly from that of Green. Specifically, Franks testified that when Simmons left the apartment in the afternoon, he said he would return later. She further testified that when defendant, Neal and Adkins entered the apartment after firing their guns outside, defendant walked toward Simmons, who was in the hallway. Franks overheard Simmons ask "who was that" (apparently in reference to the shots fired outside) (Tr. 277), and defendant said "it was me." (Tr. 277.) Franks then heard someone say "No, man." (Tr. 282.) After she heard two gunshots, she ran out of the apartment. Green followed her, screaming "Boobie shot Black. Boobie shot Black." (Tr. 284.)
Shortly after the shooting, police officers dispatched to the scene found Simmons lying dead in the street. A blood trail led from Simmons' body to Green's apartment. One .25 caliber and several .45 caliber and 9-millimeter shell casings were recovered from the front lawn of the apartment building. No weapons were recovered from the apartment or Simmons' body. A .25 caliber bullet fragment was recovered from the hallway and a 9-millimeter shell casing was found inside the bathroom. No 9-millimeter size bullet holes were found inside the apartment.
Dr. Patrick Fardal of the Franklin County Coroner's office performed an autopsy on Simmons. According to Dr. Fardal, Simmons suffered two gunshot wounds. One of the wounds was a one-quarter inch perforation to the upper left chest. The bullet passed into the left chest cavity, injuring the left lung; it then injured blood vessels in the mediastinum area and deposited in the right side of the chest, injuring the right lung. A .25 caliber bullet fragment was recovered from the right chest area. Mark Hardy, Columbus Police Criminalist, testified that the bullet fragment recovered from the chest was fired from the same gun as the .25 caliber bullet fragment found inside the apartment. According to Dr. Fardal, the pathway of the bullet was "from his [Simmons] front side to his back side, from his left to his right and * * * in a downward direction if the patient is in a normal upright position." (Tr. 86.) The chest wound was fatal, as it perforated both lungs and the right pulmonary artery, causing Simmons to bleed to death.
The other gunshot wound was a one-quarter inch perforation to the left cheek, approximately six inches from the top of the head and about one and one-half inches to the left of the midline near the nose. The bullet traveled downward and exited the cheek about nine inches from the top of the head and about two inches to the left of the midline. No slug was recovered from the cheek; however, Dr. Fardal opined that this gunshot wound was probably caused by a .25 caliber weapon.
Defendant testified on his own behalf. He admitted that Simmons was at Franks' apartment when he and Neal were there during the afternoon of March 11, 1999; however, he denied saying that he should "do" Simmons or that he and Neal otherwise discussed robbing Simmons. He further admitted that he later returned to the apartment with a 9-millimeter gun and that he fired his gun outside the apartment that evening.
Defendant further testified that when he entered the apartment after firing shots outside, he encountered Simmons in the hallway. According to defendant, Simmons was carrying a .25 caliber gun. Defendant also stated that Simmons asked him who had been shooting and that he responded that it was him and his friends. When Simmons started to walk down the hallway toward the back of the apartment, defendant followed him because he (defendant) was going to store his gun in Franks' bedroom closet. On the way down the hall, defendant flipped out a shell casing that was still lodged in his weapon. Simmons then glanced at defendant's gun. He appeared to be frightened and then rushed at defendant, holding his gun in his right hand.
Defendant testified that he and Simmons grabbed each other's arms in an effort to wrestle the gun away from the other person. At one point, defendant pushed Simmons' right hand above Simmons' head, and the gun Simmons was holding "went off twice * * * back to back." (Tr. 364.) Defendant denied pulling the trigger of Simmons' gun or firing his own weapon. Defendant admitted that he did not report the matter to the police. He denied that he intended to rob Simmons or that he took Simmons' gun after Simmons was shot.
By his first and second assignments of error, defendant challenges his convictions for aggravated robbery and involuntary manslaughter as against the sufficiency and weight of the evidence.
"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. We begin by addressing defendant's sufficiency arguments. In reviewing a claim that a criminal conviction is against the sufficiency of the evidence, an appellate court must determine whether the evidence presented at trial, viewed in a light most favorable to the prosecution, would allow a rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In other words:
 A challenge to the sufficiency of evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial. On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. * * * [Thompkins, supra, at 390. (Cook, J., concurring).]
Whether the evidence is legally sufficient to sustain a verdict is a question of law. Thompkins, at 386.
Relevant to the instant matter, aggravated robbery is defined in R.C.2911.01(A)(1) as follows:
 No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]
To this end, Green testified that a few hours before Simmons was killed, she overheard defendant tell Neal that he wanted to "do" Simmons. Green understood the comment as a reference to robbing Simmons. Franks testified that when Simmons left Green's apartment, he stated, in defendant's presence, that he would return later that evening. Defendant and his friends also returned to Green's apartment later that evening. Green testified that immediately after entering the apartment, defendant displayed a deadly weapon and followed Simmons to the back of the apartment. Both Franks and Green heard Simmons say "no" to defendant. Green saw the two men engaged in a struggle. Given defendant's prior statement about robbing Simmons, the trial court, as the trier of fact, was entitled to conclude that the genesis of Simmons' "no" statement and the ensuing struggle was an ongoing robbery attempt. The fact that neither Green nor Franks heard defendant demand money or property did not mean that such a demand was not quietly made, thereby triggering the altercation. The aforementioned testimony provides ample evidence from which a rational trier of fact could find that defendant attempted to rob Simmons by means of a deadly weapon, thereby committing aggravated robbery.
We now turn to defendant's claim that the evidence was insufficient to support the conviction for involuntary manslaughter. R.C. 2903.04 sets forth the elements of involuntary manslaughter in relevant part as follows:
 No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit a felony.[4] (Emphasis added.)
In order to convict defendant of involuntary manslaughter under R.C.2903.04(A), the state was required to establish that: (1) Simmons' death was the (2) proximate result of (3) defendant's attempted aggravated robbery of Simmons. See State v. Robinson (1994), 98 Ohio App.3d 560; State v. Sowell (Feb. 18, 1992), Franklin App. No. 91AP-773.
Defendant contends that he cannot be convicted of involuntary manslaughter because "Simmons was shot by his own gun and by his own hand during the struggle." (Defendant's brief at 8.) We reject this argument for two reasons.
Initially, we note that, even if Simmons accidentally killed himself during the attempted aggravated robbery, such circumstance would provide defendant no defense to the involuntary manslaughter conviction. "The term `proximate result' in R.C. 2903.04 embodies traditional notions of foreseeability." State v. Andrews (June 17, 1999), Franklin App. No. 98AP-707, unreported, citing State v. Losey (1985), 23 Ohio App.3d 93,95; State v. Chambers (1977), 53 Ohio App.2d 266, 272. "[W]hen a person, acting individually or in concert with another, sets in motion a sequence of events, the foreseeable consequences of which were known or should have been known to him at the time, he is criminally liable for the direct, proximate and reasonably inevitable consequences of death resulting from the original criminal act." Id. at 272-273. "It is not necessary that the accused be in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." Losey, supra, at 96.
In the present case, the evidence established that, during defendant's aggravated robbery of Simmons, the two men, both armed with guns, engaged in a struggle. This evidence is sufficient to permit a trier of fact to reasonably find that defendant's aggravated robbery of Simmons set in motion a sequence of events which could foreseeably result in Simmons' death, whether by defendant's hand and weapon or by Simmons' hand and weapon. One natural and logical consequence of an armed robbery is that the victim will attempt to resist or escape and that the victim or someone else may be killed in the process. Indeed, "[e]very robber * * * knows when he attempts to commit his crime that he is inviting dangerous resistance." Chambers, supra, at 272. Even if Simmons accidentally shot himself with his own gun, the accidental firing of a gun (with the concomitant potential for death) was a reasonable and foreseeable consequence of defendant committing aggravated robbery. Defendant's effort to rob Simmons invited resistance by Simmons, and the struggle invited any accidental discharge of a weapon. Accordingly, defendant is liable for involuntary manslaughter, even under defendant's theory that Simmons shot himself.
Moreover, the testimonial and physical evidence refutes the contention that Simmons shot himself. Green testified that she saw defendant fire a gun at Simmons; Franks testified that, after the shooting, Green ran out of the apartment screaming that defendant shot Simmons. Dr. Fardal testified that the bullet that killed Simmons moved at a downward angle from left to right in Simmons' chest. Defendant contended that Simmons was holding a gun in his right hand during the struggle. In addition, Simmons' clothing was examined, and there was no indication of stippling on that clothing, a fact which indicates that the gun was fired from at least two feet away. Given these facts, it was highly unlikely, if not impossible, for Simmons, using his right hand, to fire a fatal shot into his left chest at the downward left-to-right angle indicated by the physical evidence and to place the gun two or more feet away from himself in order not to leave stippling on his clothing.
When viewed as a whole, the evidence supports the view that if Simmons was killed by his own .25 caliber weapon,[5] it was because the taller and larger defendant disarmed him of the weapon first and then used it to fire the fatal shot into Simmons' left chest. The trial court was not required to accept the version of events offered by defendant. A trier of fact is free to believe all, part or none of the testimony of each witness who appears before it. State v. Nicols (1993), 85 Ohio App.3d 65,76.
Having found sufficient evidence to support defendant's aggravated robbery and involuntary manslaughter convictions, we turn to his manifest weight claim.
"Although a verdict is supported by sufficient evidence, a court of appeals may nevertheless conclude that the verdict is against the manifest weight of the evidence." Thompkins, supra, at 387. As noted previously, a challenge to the weight of the evidence is analytically distinct from a challenge to the sufficiency of the evidence:
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. Tibbs [v. Florida], 457 U.S. [31] at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721. ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. * * *") [Id.]
Thus, the power to reverse a judgment as against the manifest weight of the evidence and grant a new trial must be exercised with caution and only in the rare case where the evidence weighs heavily against the conviction. State v. Martin (1983), 20 Ohio App.3d 172, 175.
After reviewing the record and weighing the evidence presented in this case, we conclude that the evidence against defendant is sufficiently credible to support his convictions for aggravated robbery and involuntary manslaughter. Although Green's and Franks' versions of the events of March 11, 1999, were somewhat inconsistent, and defendant disputed some of their testimony, such is not enough to require reversal on manifest weight grounds. In State v. Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, unreported, this court stated:
 As this court has previously stated, "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly, see [State v.] DeHass [(1967), 10 Ohio St.2d 230], such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236, unreported. It was within the province of the jury to make the credibility decisions in this case. See State v. Lakes (1964), 120 Ohio App. 213, 217, 201 N.E.2d 809
("It is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness"). See State v. Harris (1991), 73 Ohio App.3d 57, 63, 596 N.E.2d 563 (even though there was reason to doubt the credibility of the prosecution's chief witness, he was not so unbelievable as to render the verdict against the manifest weight).
It would appear in the present case that the trial court afforded little weight to defendant's testimony as a whole and, in particular, did not believe his testimony that he did not intend to rob Simmons. This was well within the province of the trier of fact, and we discern no miscarriage of justice in its decision to reject defendant's claim. There is no evidence that the trial court lost its way or created a manifest miscarriage of justice. Consequently, we cannot say that defendant's convictions are against the manifest weight of the evidence. Defendant's first and second assignments of error are not well-taken.
By the third assignment of error, defendant contends that the trial court failed to make the necessary statutory findings as required by R.C. 2929.14(E)(4) to support the imposition of consecutive sentences.
If multiple prison terms are imposed on an offender for convictions of multiple offenses, R.C. 2929.14(E)(4) allows a court to impose consecutive prison terms if the court finds:
 * * * [T]hat the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2292.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
Furthermore, when the trial court imposes consecutive sentences under R.C. 2929.14, it must state on the record the necessary findings for doing so. R.C. 2929.19(B)(2)(c). The failure of the trial court to do so requires remand for sentencing. See, e.g., State v. Church (1998),129 Ohio App.3d 468; State v. Albert (1997), 124 Ohio App.3d 225; State v. Buterbaugh (Sept. 16, 1999), Franklin App. No. 98AP-1093, unreported.
As conceded by the state, a review of the record demonstrates that the trial court did not find that: (1) consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) at least one of the factors contained in R.C. 2929.14(E)(4)(a) through (c). As a result, we must remand the case to the trial court for resentencing. Defendant's third assignment of error is well-taken.
For the foregoing reasons, defendant's first and second assignments of error are overruled, and his third assignment of error is sustained. The judgment of the Franklin County Court of Common Pleas is hereby affirmed in part and reversed in part, and this cause is remanded to that court for resentencing.
 _______________ PETREE, J.
BOWMAN and KENNEDY, JJ., concur.
[1] The indictment contained three capital counts. Count one was predicated upon the commission of an aggravated robbery. Count two was based upon the commission of an aggravated burglary. Count three alleged that defendant killed Simmons with prior calculation and design. Counts four and five charged defendant with aggravated robbery and aggravated burglary, respectively.
[2] Documents in the record indicate that "Quazell" may actually be spelled "Knawel." This opinion will utilize the "Quazell" spelling used in the transcript.
[3] "Boobie" is defendant's nickname.
[4] Defendant's aggravated robbery conviction is a first degree felony pursuant to R.C. 2911.01(C).
[5] Although defendant testified that he possessed a 9-millimeter gun, the trial court was not required to believe that he possessed a 9-millimeter gun as opposed to a .25 caliber gun. No other witness was in a position to definitively confirm defendant's claim that he possessed a 9-millimeter gun. Further, there is no reason that defendant could not possess both a 9-millimeter and a .25 caliber weapon.